IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVERLINA HARP** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY** | : | NO. 04-2205 |

**Norma L. Shapiro, S.J.**                                                                                       May 31 , 2006

## MEMORANDUM & ORDER

Before the court is a motion for summary judgment filed by defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA"). Plaintiff, Everlina Harp, a former employee of defendant, in this employment discrimination action under the Americas with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, alleges she was unlawfully terminated because of her physical disability. Defendant asserts that plaintiff has failed to establish a *prima facie* case under the ADA and the PHRA, and also articulates four legitimate nondiscriminatory reasons for plaintiff's discharge: (1) falsifying documentation; (2) conduct unbecoming an employee; (3) misusing and abusing benefits; and (4) feigning illness. Because plaintiff has failed to present evidence rebutting the proffered valid reasons for plaintiff's discharge, and because her alternate arguments also fail, defendant's summary judgment motion will be granted.

**I.      Background**[1]

Harp was employed by SEPTA as a bus driver. In November 2002, she was injured in a

---

[1] All facts listed here are undisputed. Where there are disputes over certain facts, all reasonable inferences have been made in favor of the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (all reasonable factual inferences must be made in a light most favorable to the nonmoving party).

bus accident while on the job and remained out of work for approximately two months. When Harp returned to work, she was initially assigned a job as a light-duty filing assistant. In February 2003, Harp sought and received a position as a timekeeper clerk under the supervision of Anthony Teodoro. Soon afterwards, Harp was officially medically disqualified as a bus driver. Through June 2003, Harp remained on the job as a timekeeper clerk without incident. In July 2003, Harp took approximately 12 days bereavement leave. She returned to work on July 21, 2003, but the following day she suffered a reoccurrence of her prior injury while at work. She was unable to continue working and went to the emergency room. The next day, Harp filed a petition for reinstatement of workers' compensation benefits (Ex. I to Def.'s Br.), which was later denied.

   Following her visit to the emergency room, Harp received medical care from her personal physician, Joseph Cipriano, D.O., who completed a physical capacities form (Ex. G to Def.'s Br.) setting forth a litany of Harp's physical restrictions, including restrictions on squatting, bending, crawling, climbing and reaching. The form stated Harp was capable of occasionally lifting and carrying five pounds or less, and sitting for one hour during an eight-hour work day. Finally, the form stated Harp could return to work on August 5, 2003, provided that she was limited to a six-hour work day.

   On August 5, 2003, Harp returned to work, presented the physical capacities form to her supervisor, Mr. Teodoro, and worked a six-hour day. The following day, when Harp was asked to file a large amount of paperwork, she informed her supervisor she was unable to perform that task. Teodoro instructed Harp not to come to work until she felt better and told her to report to Dr. Richard Press at the SEPTA medical department. Teodoro also gave Harp a function

assessment report to be completed by her treating physician.

Harp had her treating physician, Dr. Cipriano, complete the function assessment report (Ex. K to Def.'s Br.). That report set forth restrictions similar to those in Harp's physical capacities form, with the additional provision that her sitting, standing and walking limitations would last for one year. Thereafter, Harp reported to Dr. Press, who told her she was not being cleared for any work and, as she was under active treatment, she should "stay in the sick book" until her physical condition improved. Harp 5/16/05 Dep. (Ex. B to Def.'s Br.) ("Harp Dep. I") at 301. Harp was given a SEPTA medical department encounter slip (Ex. P to Def.'s Br.) stating she was not to return to work until further notice.

Immediately after leaving the SEPTA medical department, Harp went to see Linda Yoxtheimer in SEPTA's vocational rehabilitation department in order to ask about alternate work options. At some point, Harp wrote the word "year" on the medical encounter slip on the line following the phrase "[d]ate able to return to work." See Ex. R. (altered medical encounter slip) to Def.'s Br.; Harp. Dep. I at 309. After discovering that Ms. Yoxtheimer was not in her office, Harp gave the altered medical encounter slip to Linda Suters, a workers' compensation claims adjuster for SEPTA. Harp Dep. I at 314. Ms. Suters later obtained a copy of the unaltered medical encounter slip and saw that the original did not include the word "year" on the line following the phrase "[d]ate able to return to work."

Harp received sick benefits from SEPTA until September 10, 2003. On that day, Harp testified at an unemployment compensation hearing that she had voluntarily quit her job because of health problems. Ex. J (unemployment compensation referee's notice of determination) to Def.'s Br. at 1; Harp 5/18/05 Dep. (Ex. L to Def.'s Br.) ("Harp Dep. II") at 10-13. She later was

awarded unemployment benefits. While on sick leave, Harp also sought outside employment from a temporary employment agency. Harp Dep. I at 325. On September 30, 2003, Teodoro received a phone call from a temporary job placement company concerning Harp's employment status. Teodoro filed an incident report (Ex. S to Def.'s Br.) following the call and subsequently began discharge procedures for Harp after notifying her of his intention to do so. Harp Dep. II at 22.

Harp was charged with: (1) falsifying documentation; (2) conduct unbecoming an employee; (3) misusing and abusing benefits; and (4) feigning illness. Ex. T (interview report) to Def.'s Br.. A meeting was scheduled for October 7, 2003 so that Harp's supervisors could discuss these charges with her, but she did not attend the meeting. Harp Dep. II at 28-30. A second meeting was scheduled for November 17, 2003, but once again Harp did not attend. Harp Dep. II at 34. She was discharged shortly thereafter. Before her termination, Harp never gave her supervisors a reason – legitimate or otherwise – for altering the medical encounter slip and handing it to Suters. Harp Dep. II at 35-37.

## II.    Discussion

### A.    Standard of Review

Summary judgment is appropriate where the record shows there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which bear upon the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable factual inferences must be made in a light most favorable to the nonmoving party. Id. at 255. However, the nonmoving party bears the burden to establish the existence of each element of her case. Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1991). In doing so, the plaintiff must present specific evidence from which a reasonable fact finder could conclude in her favor. Anderson, 477 U.S. at 248; Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000). Mere conclusory allegations or denials are not enough to preclude summary judgment. Jones, 214 F.3d at 402; Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).

Plaintiff has brought claims under both the ADA and the PHRA; these claims are treated as coextensive of one another. Jones v. School District of Philadelphia, 198 F.3d 403, 409 (3d Cir. 1999); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). If summary judgment is appropriate under the ADA, summary judgment is also appropriate under the PHRA. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004).

### B. *Prima Facie* Case of Disability Discrimination

To establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer;[2] and (3) she has suffered an otherwise adverse employment action as a result of discrimination. Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006); Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). Although it is not certain that, at the time of her discharge, Harp was a disabled person under the ADA or was otherwise

---

[2] SEPTA asserts Harp is judicially estopped from arguing she is a qualified individual under the ADA because she previously stated in a petition for workers' compensation benefits, dated July 22, 2003, that she "can no longer work." Ex. I (petition to reinstate benefits) to Def.'s Br. at 1. It is unclear whether Harp's statement referred to total disability or took into account her entitlement to reasonable accommodation. In Turner v. Hershey Chocolate USA, 440 F.3d 604, 608 (3d Cir. 2006), the court of appeals rejected a similar judicial estoppel argument for this reason. Harp is not judicially estopped from bringing her claim.

qualified to perform the essential functions of a timekeeper clerk, the court will assume without deciding that Harp has established a *prima facie* case of discrimination.³  See Turner, 440 F.3d at 614 (reversing district court's grant of summary judgment and "caution[ing] against any premature determination of what is an essential function" or a "reasonable accommodation" under the ADA).

    **C.**    **Pretext**

If a plaintiff succeeds in establishing a *prima facie* case of employment discrimination under the ADA, the burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the adverse employment action it has taken.  Shaner, 204 F.3d at 500; Jones, 198 F.3d at 410.  After the employer proffers a valid business reason for its action, any presumption of discrimination disappears, and the plaintiff must present sufficient evidence "from which a fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."⁴  Walton v. Mental Health Ass'n of Southeastern

---

    ³    The parties have not addressed whether the adverse employment action was Harp's placement in the sick book or her ultimate termination.  Plaintiff does not argue that her placement in the sick book constituted an adverse employment action under the ADA.  The parties appear to agree that Harp's termination in November 2003 was an adverse employment action under the ADA.  The sole federal count of plaintiff's amended complaint, count one, is entitled "ADA-Failure to Accommodate Unlawful Termination."  Am. Compl. at 4.  The court will treat Harp's termination as the adverse employment action giving rise to her discrimination claim.

    ⁴    Although originally set forth for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), this three-part burden-shifting framework now applies to ADA and ADEA claims, as well as claims brought under 42 U.S.C. § 1981 and the Rehabilitation Act.  See Shaner, 204 F.3d at 500 (ADA disparate treatment and retaliation); Walton v. Mental Health Ass'n of Southern Pa., 168 F.3d 661, 667-68 (3d Cir. 1999) (ADA termination); Brewer v.

(continued...)

Penn., 168 F.3d 661, 668 (3d Cir. 1999); Sheridan v. E.I. Dupont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc). A plaintiff can rebut a legitimate, nondiscriminatory reason for termination only if the stated reason is merely a "post hoc fabrication or otherwise did not actually motivate the employment action." Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 386 (3d Cir. 1999). Although "the burden of production may shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Shaner, 204 F.3d at 500-01 (citation omitted).

In the absence of direct evidence of discrimination, "a plaintiff may rely on circumstantial evidence to 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered legitimate reasons so as to permit a reasonable fact finder to infer that the employer did not act for the proffered reasons" and instead had a discriminatory motive. Shaner, 204 F.3d at 503 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)). It is not sufficient for a plaintiff to show that the employer's decision was wrong or mistaken; "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765; see also Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its

---

[4](...continued)
Quaker State Oil Refining Corp., 72 F.3d 326, 330 (3d Cir. 1995) (ADEA); Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 385 (3d Cir. 1999)(Section 1981); Antol v. Perry, 82 F.3d 1291, 1299 (3d Cir. 1996) (Rehabilitation Act). The mixed-motives framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989) can apply alongside or in place of the McDonnell Douglas framework, but does not apply in this case. See infra part D.

behavior.").

Although "a plaintiff's own affidavit providing circumstantial evidence of discrimination may in certain cases be sufficient by itself to withstand a defendant's motion for summary judgment," Pamintuan, 192 F.3d at 387, a plaintiff's pretext rebuttal is insufficient if it is not supported by evidence and is based on nothing more than plaintiff's personal opinion of her employer's proffered reason.  Compare Sarullo v. U.S. Postal Service, 352 F.3d 789, 800 (3d Cir. 2003) (affirming grant of summary judgment for employer where plaintiff's rebuttal was insufficient for these reasons), and Jones, 198 F.3d at 414 (same), and Pamintuan, 192 F.3d at 387 (same), with Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 66-67 (3d Cir. 1996) (reversing grant of summary judgment for employer on ADEA claim where plaintiff supported his pretext rebuttal with the depositions of several co-workers) and Antol v. Perry, 82 F.3d 1291, 1300-03 (3d Cir. 1996) (reversing grant of summary judgment for employer on Rehabilitation Act claim based upon similar evidence).

Harp does not contest that SEPTA has met its burden of production by articulating four legitimate nondiscriminatory reasons for firing her: (1) falsifying documentation; (2) conduct unbecoming an employee; (3) misusing and abusing benefits; and (4) feigning illness.  See Ex. T (interview report) to Def.'s Br.; Pl.'s Br. at 18.  The only issue is whether Harp has presented sufficient evidence to rebut SEPTA's proffered business reasons for terminating her.  Harp's claim fails at this final stage; she has not presented any evidence from which a jury could conclude by a preponderance of the evidence that SEPTA's legitimate reasons for firing her were pretexts for unlawful disability discrimination.

Harp admits that she wrote the word "year" on the medical encounter slip on the empty

line following the phrase "[d]ate able to return to work," and gave the altered slip to Linda Suters, a workers' compensation claims adjuster for SEPTA.[5]  See Ex. R (altered medical encounter slip) to Def.'s Br.; Harp. Dep. I at 309, 314.  Harp asserts that she altered the medical encounter slip "because it was her own copy and it was intended to mean that Dr. Press would not permit her to work under the 6 hour restriction for 1 year as prescribed by her treating physician."  Pl.'s Br. at 18; see also Harp Dep. I at 305-21.  While it is true that Harp's personal doctor, Joseph Cipriano, D.O., had recommended a limited work day for Harp for one year (Ex. J (function assessment report) to Def.'s Br.), the clerk from SEPTA's medical department had specifically indicated on Harp's medical encounter slip that the time period for Harp's work restrictions was open-ended (Ex. P (medical encounter slip) to Def.'s Br.).  Harp's explanation for altering her medical encounter slip and handing it to Linda Suters, one of SEPTA's workers' compensation claim adjusters, does not suggest that the first of SEPTA's legitimate reasons for firing her – falsifying documentation – was a pretext for disability discrimination.  Harp never told her supervisors why she had altered the slip, and she failed to attend the meetings they scheduled upon the commencement of her discharge proceedings.  Harp Dep. II at 28, 34-38.  Although Harp may have had a legitimate excuse for altering the medical slip, SEPTA had no way of knowing it before discharging her.[6]

---

[5]  Harp had filed for workers' compensation benefits approximately three weeks earlier, on July 22, 2003.  See Ex. I (petition to reinstate benefits) to Def.'s Br..

[6]  Harp claims she was justified in not attending the meetings she knew SEPTA had scheduled because her union representative was supposed to go on her behalf, but failed to do so.  Harp Dep. II at 24-34.  This assertion does not show that the first of SEPTA's valid reasons for firing Harp was a pretext for unlawful discrimination.  Because she never told her supervisors why she altered the medical slip before handing it to Suters, SEPTA reasonably could have
(continued...)

Harp also asserts that she informed Ms. Suters that the altered medical encounter slip was intended for Linda Yoxtheimer, who worked in SEPTA's vocational rehabilitation department. Pl.'s Br. at 18; Harp Dep. I at 283-87.  This might show that Harp did not intend to engage in workers' compensation fraud specifically, but it fails to establish that Harp was not engaging in the falsification of records for some other reason, or that SEPTA's first reason for firing her was a pretext for discrimination.

Harp asserts Anthony Teodoro was aware of her falsification of documents on August 13, 2003, yet failed to take action until October 2, 2003; she argues this six-week delay, from the time SEPTA learned the medical slip was altered until the commencement of Harp's discharge proceedings, shows that SEPTA's first reason for termination was pretextual.  See Pl.'s Br. at 19. A six-week delay alone is not enough to establish that SEPTA's first justification for firing Harp was a pretext for disability discrimination.  This is particularly true in light of SEPTA's other justifications for termination – conduct unbecoming an employee, misusing and abusing benefits, and feigning illness.  On September 30, 2003, Teodoro discovered that Harp was seeking work from a temporary job placement agency while on sick leave at SEPTA.  See Ex. S (incident report) to Def.'s Br..  Two days later, Teodoro began gathering information to commence discharge proceedings because it appeared, at that time, that Harp had falsified records, misused benefits, and feigned illness.

Harp makes the final argument that Teodoro did not "believe[] that Harp was falsifying a document." Pl.'s Br. at 19.  In support, Harp cites a portion of Teodoro's deposition testimony

---

[6](...continued)
concluded, at the time of Harp's discharge, that Harp did not contest SEPTA's articulated justifications for seeking to terminate her employment.

from her workers' compensation proceedings. Teodoro 5/25/04 Dep. (Ex. G to Pl.'s Br.) ("Teodoro Dep.") at 45-46. The cited testimony fails to demonstrate pretext and the testimony immediately preceding it actually *supports* SEPTA's rationale for firing Harp. After being asked to give his "own opinion" as to "why [Harp] would have wanted to write the word 'year'" on the medical encounter slip before handing it to Suters, Teodoro speculated that, "since Workers' Comp. wasn't paying her . . . she must have been a little disturbed or something that Workers' Comp. wasn't picking it up. So she went up to the sixth floor to turn the paperwork in to Workers' Comp.." Teodoro Dep. at 44-45. Teodoro's testimony confirms that Harp altered the slip and handed it to a workers' compensation claims adjuster, and suggests that she did so in order to acquire workers' compensation benefits after they were previously denied.

      The court need not address SEPTA's other justifications for termination in great detail because "conduct unbecoming an Authority employee," "misuse and abuse of Authority benefits," and "fainting [i.e., feigning] illness" are essentially derivations of SEPTA's first justification, "falsifying documentation," addressed above. Ex. T (interview report) to Def.'s Br.. In any case, Harp has failed to rebut these valid reasons as well. Harp argues that her attempt to seek temporary work while placed in SEPTA's sick book does not show that she engaged in conduct unbecoming an employee or feigned illness. Pl.'s Br. at 20-21. But the record shows this is just one instance prior to her firing in which SEPTA could have reasonably concluded that Harp was being dishonest about her medical condition. The uncontested facts surrounding Harp's falsification of a medical document adequately support SEPTA's conclusion that Harp was engaging in conduct unbecoming an employee and feigning illness.

      With regard to misusing and abusing benefits, Harp argues this reason is unsupported by

evidence because the "overpayment of sick benefits was due to an error on the part of SEPTA." Pl.'s Br. at 19; see also Teodoro Dep. at 57 (discussing SEPTA's overpayment of sick benefits to Harp, and acknowledging it was not her fault). But SEPTA's articulated reason does not refer to the misuse of sick benefits specifically; it addresses "benefits" generally. See Ex. T (interview report) to Def.'s Br.. The uncontested facts surrounding Harp's falsification of a medical document, which she handed to a workers' compensation claims adjuster, adequately supports SEPTA's conclusion that Harp was attempting to misuse employee benefits.

Harp has not presented evidence to show that SEPTA's articulated legitimate reasons for firing her were pretextual. She has not produced evidence from which a fact finder could reasonably either disbelieve SEPTA's assertion that it fired her for falsifying documents, conduct unbecoming an employee, misusing and abusing benefits, or feigning illness, or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

### D. Mixed-Motives

Harp makes the alternate claim that, after Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), she can proceed with her ADA claim under both the McDonnell Douglas burden-shifting approach and the mixed-motives approach enunciated in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989). In Price Waterhouse, the Supreme Court addressed the situation where an employer has both legitimate and illegitimate reasons for making an adverse employment decision, and held, where the illegitimate reason was a motivating force behind the decision, the employee's Title VII claim can succeed unless the employer is able to show by a preponderance of the evidence that the same action would have been taken absent the illegitimate reason. Id.

Following the passage of the Civil Rights Act of 1991 two years later, some lower courts required a Title VII plaintiff to produce direct evidence of discrimination in order to proceed under the mixed-motives approach enunciated in Price Waterhouse.  See Desert Palace, 539 U.S. at 94-95 (discussing the relevant statutory provisions and lower court cases).  In Desert Palace, the Supreme Court clarified the mixed-motive framework by holding that a mixed-motives jury instruction could be given in a Title VII case even if only circumstantial evidence of discrimination had been presented at trial.  539 U.S. at 101.  Harp, who presents only circumstantial evidence of discrimination, argues from Desert Palace that she can proceed under Price Waterhouse if she is unable to show pretext under the McDonnell Douglas.

Harp's argument fails because the mixed-motives framework used in Desert Palace has not been extended to the ADA in a summary judgment context.  Chubirka v. Int'l Paper/Xpedx Paper & Graphics, No. 04-5010, 2005 WL 1840170, at *3 n.6 (E.D. Pa. Aug. 2, 2005) ("Desert Palace . . . is inapplicable in this case inasmuch as Desert Palace addresses statutorily-based, post-trial jury instructions in a Title VII case, and has not been extended to ADA or ADEA claims in the summary judgment context by the Third Circuit.").  In post-Desert Palace actions similar to this, the Supreme Court has continued to apply the McDonnell Douglas burden-shifting approach.  See, e.g. Raytheon Co. v. Hernandez, 540 U.S. 44, 50-51 (2003) (approving use of McDonnell Douglas framework at summary judgment stage in an ADA disparate treatment action).  The Third Circuit has done so also.  See, e.g. Williams v. Philadelphia Housing Auth. Police Dep't, 380 F.3d 751, 761-62 (3d Cir. 2004) (using McDonnell Douglas framework in post-Desert Palace ADA action where plaintiff introduced only circumstantial evidence of disparate treatment).

Consequently, in an ADA action, if direct evidence of discrimination is produced, the Price Waterhouse framework applies; if circumstantial evidence of discrimination is produced, the McDonnell Douglas framework applies; if both kinds of evidence are produced, both frameworks apply. See Glanzman v. Metropolitan Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004) (ADEA action); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 n.4 (3d Cir. 2003) ("Referring to these theories [i.e., "a pretext suit" and "a mixed-motives suit"] as though they . . . encompass two mutually exclusive legal theories is as troublesome as it is misleading."). Harp has failed to produce any direct evidence of unlawful discrimination, i.e., evidence that is "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age [or here, disability] in reaching their decision." Glanzman, 391 F.3d at 512. She cannot proceed under a mixed-motives approach.

### E. Interactive Process

Harp also argues that SEPTA failed to engage in the "interactive process." The federal regulations associated with the ADA provide that, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity [i.e., the employer] to initiate an informal, interactive process with the qualified individual with a disability [i.e., the employee] in need of accommodation." 29 C.F.R. § 1630.2(o)(3). The interactive process requires both parties "to assist in the search for appropriate reasonable accommodation and to act in good faith." Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997). If an employer fails to engage in the interactive process, it risks violating the ADA's requirement to provide reasonable accommodation to a disabled but otherwise qualified employee. Shapiro v. Township of Lakewood, 292 F.3d 356, 359 (3d Cir. 2002); Deane v. Pocono Med. Ctr., 142 F.3d 138, 149 (3d

14

Cir. 1998) (en banc).

The sufficiency of the interactive process would be relevant if the court were granting summary judgment for SEPTA based on its argument that it would have been impossible or an undue burden to accommodate Harp's physical limitations. But summary judgment will not be granted on these grounds; rather, it will be granted because SEPTA has articulated legitimate reasons for Harp's termination which Harp has been unable to show were pretexts for disability discrimination. SEPTA's justifications for termination are independent of the interactive process; the interactive process need not be addressed.[7]

**III.   Conclusion**

There is no genuine issue of material fact; summary judgment will be granted for the defendant. An appropriate order follows.

---

[7] If the interactive process were relevant, Harp's argument would still be without merit in light of SEPTA's attempts to communicate with Harp in person, by phone, by fax, or through the scheduled meetings. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317 (3d Cir. 1999) (describing the steps an employer might take to engage in the interactive process, similar to those steps taken by SEPTA); see also Mengine, 114 F.3d at 421 (an employer's suggestion that a disabled employee consider disability retirement is not evidence of bad faith).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVERLINA HARP** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY** | : | **NO. 04-2205** |

# ORDER

    **AND NOW**, this 31st day of May, 2006, upon consideration of defendant's motion for summary judgment and plaintiff's opposition thereto, after a hearing on September 20, 2005 at which counsel for both parties were heard, for the reasons included in the accompanying memorandum, it is **ORDERED**:

1. Defendant's motion for summary judgment (paper # 19) is **GRANTED**.

2. **JUDGEMENT** is **ENTERED** in favor of defendant and against plaintiff.

3. The clerk is directed to mark this action **CLOSED**.


                                                    /s/ Norma L. Shapiro
                                                    Norma L. Shapiro, S.J.